**In re KORS, INC., Debtor.**

**Bankruptcy No. 80–00255.**

United States Bankruptcy Court,
D. Vermont.

Aug. 14, 1981.

Charles H. Gibbs, Jr., Charleston, S.C., and Dennis I. Greene, Boston, Mass., for First Nat. Bank of Boston.

Bernard R. Dick, and William C. Dagger, Rutland, Vt., for The Howard Bank.

James S. Abatiell and Alan R. Medor, Rutland, Vt., for Rutland Indus. Development Corp.

John Paul Faignant of Miller, Norton & Cleary, Rutland, Vt., for Rextrusion Systems, Inc.

Amplas Machinery Systems, Inc., pro se.

Peter H. Banse of Keyser, Crowley, Banse, Abel & Facey, Rutland, Vt., for debtor. ·

Glenn S. Morgan, Rutland, Vt., for Rutland Sav. Bank.

Andrew R. Field, Montpelier, Vt., for S.B. I.C. of Vermont, Inc.

## MEMORANDUM, FINDINGS OF FACT AND CONCLUSIONS

CHARLES J. MARRO, Bankruptcy Judge.

The consolidated Motions of the First National Bank of Boston, of The Howard Bank, of Rutland Industrial Development Corporation, of Rextrusion, Inc., and of Amplas Machinery Systems, Inc., came on for hearing, after notice.

The grounds alleged for the conversion in the combined Motions are that it will be in the best interests of the creditors and of the estate to convert to Chapter 7; that the First National Bank of Boston will reject the Plan and, in view of this rejection, the Plan could not be accepted unless there were sufficient assets to effectuate a "cram-down" and that there are not sufficient assets available to allow the Debtor to enter into any serious cram-down considerations; that the majority shareholders are the only ones benefitting from a continued operation of the business; that there is a continuing loss to and diminution of the estate; that there is no reasonable likelihood of rehabilitation of the Debtor or its business; that the Debtor has unreasonably delayed progress of the case without just cause; that the Debtor has failed to propose a Plan which is sufficient as a matter of law; that the Reorganization Plan and subsequent Disclosure Statement, even viewed in a light most favorable to the Debtor, show a seriously prejudicial impairment of the claims of secured creditors and the value of the collateral of such creditors continues to erode.

## FACTS

Kors, Inc., the Debtor, is a company engaged in the production of high density polyethelyne in the form of film and its products are sold as rolls of film or converted to bags, wrapping material, or other items. It commenced business in August, 1976, in Saddle Brook, New Jersey, but relocated its business in Rutland, Vermont, in January, 1979. Its president and chief executive officer is Robert Kotzek, who is highly skilled in the technical aspects of the business, but has limited training in finance and accounting.

The Debtor filed its Petition for Relief under Chapter 11 of the Bankruptcy Code on November 24, 1980 and on December 16, 1980 it filed its Statement of Affairs with Schedules which show liabilities of $5,461,-007.81 and assets of $3,961,505.28. Its business in Rutland, Vermont has been financed through Rutland Industrial Development Corporation/The Howard Bank, S.B.I.C. of Vermont, Inc., and the First National Bank of Boston. The Small Business Administration has also guaranteed a percentage of some of the loans. In addition, the Debtor purchased bag machines from Rextrusion Systems, Inc., and Amplas Machinery Systems, Inc., which are subject to security interests in favor of the sellers.

The Debtor's place of business is at 56 Howe Street in the City of Rutland, and the premises together with certain machinery and equipment are leased from Rutland Industrial Development Corporation with the rentals under the lease assigned to The Howard Bank to secure payment of loans made by the Bank to the Debtor.

The Howard Bank has filed a claim in the sum of $2,591,841.15.

Rextrusion Systems, Inc., and Amplas Machinery Systems, Inc., have filed secured claims in the sums of $119,870.00 and $110,-365.39, respectively.

The First National Bank of Boston has a first security interest in the inventory and accounts receivable of the Debtor and on May 20, 1981 this Court entered an Order establishing the value of the security of FNBB in accounts receivable, inventory and proceeds as of November 24, 1980 at $350,-000.00.

S.B.I.C. of Vermont, Inc., has a subordinate security interest in inventory and accounts receivable for approximately $817,000.00.

The Schedules also show that the Debtor is obligated to employees for wages in the sum of $7,046.12, to Internal Revenue Service for payroll taxes in the sum of $54,-706.59, to the State of Vermont for payroll taxes in the sum of $5,512.17 and to the City of Rutland for personal property taxes in the sum of $12,000.00.

On March 24, 1981 the Debtor filed the semblance of a Plan which contained written notations that parts of paragraphs were stricken out and there were marginal notes in pencil. It appeared to be more of a worksheet than a finished product.

On March 26, 1981 the Debtor filed a Modified Plan of Reorganization which provides for the payment of administration expenses, priority claims for wages and unsecured claims of less than $500.00 in full upon the effective date of the Plan and for the payment of the priority claim of Internal Revenue Service for taxes over a six-year period from the date of assessment. It further provides for the treatment of other impaired claims and interests as follows:

"*Class B*: The First National Bank of Boston will be paid the allowed amount of its secured claim, without interest, six (6) years after the effective date of the Plan, said payment to be secured by a continuing first lien on the Debtor's inventory and accounts receivable.

*Class C*: Those items of machinery and equipment listed in Schedule A will be surrendered to RIDC/Howard Bank with credits as indicated in Schedule A against their secured claim; the balance of RIDC/Howard Bank's secured claim will be paid, without interest, eight (8) years after the effective date of the Plan. Title to all machinery and equipment formerly subject to the RIDC-Kors, Inc. lease-purchase agreement, except those items listed in

Schedule A, will pass, by bill-of-sale, to Kors, Inc., and the foregoing payments to RIDC/Howard Bank shall be secured by a first security interest in all of Debtor's machinery and equipment, except those items included in Class D and E.

*Class D* : The secured claim of Amplas Machinery Systems, Inc., will be paid in full, without interest, five (5) years after the effective date of this Plan, said payments to be secured by a continuing lien on its present collateral.

*Class E* : Rextrusion Systems, Inc., will be paid the allowed amount of its secured claim, without interest, five (5) years after the effective date of this Plan, said payments to be secured by a continuing first lien on its collateral.

*Class F* : The Rutland Savings Bank will be paid 15% of its secured claim within two (2) years of the effective date of this Plan.

*Class G* : S.B.I.C. of Vermont, Inc., and Memorial Drive Trust will receive 800 shares of $1,000 par value 8% noncumulative voting preferred stock in full satisfaction of its secured claim.

*Class I* : Unsecured claims exceeding $500 will be paid 10% of the claims within three (3) years of the effective date of this Plan."

The Debtor filed a Disclosure Statement on April 20, 1981 which the Court, on objection, found to be inadequate and ordered it to file an amended statement which would include, among other things, income statements for the periods April 1, 1980 to November 24, 1980 and from November 24, 1980 to May 18, 1981. The Amended Disclosure Statement was filed on June 4, 1981, included in which was an income statement for the period November 24, 1980 to May 18, 1981, which showed an operating profit of $48,355.00. However, this profit was based on a beginning inventory on November 24, 1980 of $43,140.00 when, as a matter of fact, the ending inventory for the period of April 1, 1980 to November 24, 1980 was $165,527.00. There is no justifiable basis for the write-down of the inventory from $165,527.00 to $43,140.00 on the same date, especially in view of the fact that there had been a previous write-down of inventory on October 31, 1980.

The statement for the period 11/24/80—5/18/81 also shows accrued rent of $28,797.00 and unpaid debt service of $250,550.00. With the proper adjustment for inventory based on the ending figure of $165,527.00 for the period 4/1/80—11/24/80 the Debtor actually sustained an operating loss of $102,387.00 instead of a profit of $48,355.00.

On March 1, 1981, the Debtor turned over to FNBB accounts receivable having a book value of $154,000.00 but an actual value of approximately $23,000.00 resulting in a diminution of the collateral subject to the security interest of FNBB of $131,000.00 and the Debtor has no unencumbered assets to furnish adequate protection to FNBB for the decrease in the value of this collateral.

The value of the bag machine subject to the security interest of Rextrusion Systems, Inc., depreciates at the rate of $1,400.00 a month and on May 20, 1981, the Court, after hearing, continued the automatic stay subject to the proviso that the Debtor pay to Rextrusion Systems, Inc., the depreciation occurring from the date of the filing of the Petition on November 20, 1980.

The Arvor bag machines subject to the security interest of Amplas Machinery Systems, Inc., depreciate at the rate of 20% to 25% per year, and the Lemo machines and other equipment subject to the security interest of The Howard Bank depreciate at the rate of 20% per year.

The cash deposit required of the Debtor to implement the Plan upon confirmation is at least $102,000.00 and may be subject to an increase of $60,000.00 for rent and the total assets available to meet this required deposit consist of $56,000.00 in cash and $72,000.00 in accounts receivable. Assuming that the accounts receivable are 100% collectible, the Debtor even without payment of rent would barely have enough money on hand to meet the required deposit leaving it without any working capital and no source from which to obtain it.

The implementation of the proposed Plan and the continuation of the business by the Debtor as a going concern requires the infusion of at least $700,000.00 which must be made available either through financing from a lending institution or from an equity investor and the Debtor is unable to obtain this working capital from either source.

The figures shown in the Amended Disclosure Statement and the projections of cash flow are not reliable and they do not reflect an accurate assessment of the past and anticipated performance of the Debtor.

Rutland Industrial Development Corporation, The Howard Bank, the First National Bank of Boston, and Amplas Machinery Systems, Inc., as secured creditors, have all expressed an intention not to accept the Plan.

On August 23, 1978 the Debtor executed and delivered to its president, Robert M. Kotzek, and his wife, Vera A. G. Kotzek, a promissory note in the sum of $6,000.00 payable on or before May 1, 1980. This note recited that it was secured by a security agreement of even date with a 1976 Mercedes as collateral. Up to the present time the security agreement has not been produced even though several requests have been made for it. A Certificate of Title, however, was issued by the Motor Vehicle Department on July 16, 1979 indicating that a 1976 Mercedes was titled on July 16, 1979 and it showed Robert and Vera Kotzek as lienholders.

On the eve of the filing of the Petition; i. e., November 23, 1980, the President of the Debtor, Robert M. Kotzek, repossessed the Mercedes Benz automobile belonging to the Debtor on the basis of the alleged security interest.

The Debtor from the time of the location of its business in Rutland, Vermont, has had continuous financial problems.

## MEMORANDUM AND CONCLUSIONS

■ Under § 1112(b) of the Bankruptcy Code, on the request of a party in interest and, after notice and a hearing, the Court may convert the case under this chapter to one for liquidation under Chapter 7 or may dismiss a case under this chapter, whichever is in the best interest of the creditors and the estate, for cause including:

(1) continuing loss to or diminution of the estate and absence of a reasonable likelihood of rehabilitation;

(2) inability to effectuate a plan;

(3) unreasonable delay by the debtor that is prejudicial to creditors;—

The grounds for converting to Chapter 7 are not restricted to those enumerated under § 1112(b). 5 Collier 15th Ed. 1112–14 § 1112.03(d). A Bankruptcy Court has the inherent power and duty under this section to inquire into the good faith of a debtor seeking Chapter 11 Relief. *In re G–2 Realty Trust*, 6 B.R. 549, 2 C.B.C.2d 1344 (Bkrtcy.D.Mass.).

A debtor's lack of good faith constitutes cause for dismissal of the debtor's Chapter 11 case within the meaning of § 1112(b) of the Code. *In re Tolco Properties, Inc.*, 6 B.R. 482, 3 C.B.C.2d 100 (Bkrtcy.E.D.Va.). Lack of good faith would likewise constitute "cause" for converting to Chapter 7.

## AS TO CONTINUING LOSS TO AND DIMINUTION OF THE ESTATE AND ABSENCE OF A REASONABLE LIKELIHOOD OF REHABILITATION

The evidence clearly establishes that the value of the collateral subject to the security interest of FNBB has been diminished and that there has been an operating loss of substantial size since the Petition under Chapter 11 was filed. It further appears that the Debtor has no assets unencumbered from which to give FNBB adequate protection and that the net result will be that this bank will suffer a substantial loss from the liquidation of its security.

From the Disclosure Statement and the application of the proper figures as to inventory, it appears that the Debtor has had an operating loss of $102,378.00. No evidence has been submitted to indicate that the trend is going to be reversed. Even assuming a positive cash flow, the Court

should consider whether the Debtor is suffering a loss by reason of the actual depreciation in the value of the property of the estate. 5 Collier 15th Edition 1112–14 and 1112–15 § 1112.03(2)(d)(i), *In re Tolco Properties, Inc.*, 6 B.R. 482, 3 C.B.C.2d 100, 107 (Bkrtcy.E.D.Va.). The undisputed evidence is that the machinery being used by the Debtor is depreciating at a very rapid rate with the result that the interests of the secured creditors are being jeopardized.

It is also clear that there is no reasonable likelihood of rehabilitation. The credible evidence indicates that the Debtor must obtain an infusion of $700,000.00 in capital if it is to continue in business as contemplated in its Plan. In view of its past record and the inability of its management to operate at a profit and the unreliability of financial information submitted in its Amended Disclosure Statement and used in the past for borrowing purposes there is no way that the Debtor may obtain the necessary capital to turn the company around.

A rehabilitation, as used in § 1112(b)(1) means to put back in good condition; re-establish on a firm, sound basis. *In Re L.S. Good and Co.*, 8 B.R. 315, 3 C.B.C.2d 785 (Bkrtcy.N.D.W.Va.). The present financial structure of the Debtor makes rehabilitation impossible and, therefore, it should not be permitted to continue in control of its business under the umbrella of the reorganization court. *In Re Good*, Supra.

The Debtor, through its president, would have you believe that the infusion of only $350,000.00 of working capital would be sufficient to rehabilitate the company. Yet in a note to a financial statement dated 6/28 the Debtor specifically stated "The Company is seeking equity financing in the amount of $750,000.00 which will be used for working capital." Further, the Debtor is representing that the necessary working capital will be generated from the continued operation of the company by improving its collection of accounts receivable and by instituting a process known as "tolling" under which the materials for manufacture will be furnished by the customers and they in turn will be billed by the Debtor for the improvement of the raw material and the transformation of it into the finished product. This is a process which is not in common use in the trade and the anticipated results are highly speculative.

It is apparent that the Debtor has no profitable core around which to structure a plan of reorganization. In such a situation, faced with continuing losses, the best interest of creditors may require the court to order liquidation of the debtor under chapter 7. While a debtor should have a fair opportunity to reorganize, such opportunity must be balanced against protection of creditors' interests. When visionary schemes for reorganization entail significant risk to creditors without any reasonable probability that the debtor can successfully rehabilitate, liquidation is generally in order. 5 Collier 15th Ed. 1112–16 § 1112.-03(d)(i).

## INABILITY TO EFFECTUATE A PLAN

The evidence clearly establishes that the Debtor after making the necessary deposit of at least $102,000.00 upon confirmation would be bereft of the cash with which to continue operation.

The four principal secured creditors have indicated a rejection of the Plan and, therefore, the Debtor will be unable to have it confirmed unless it can comply with the "cram-down" provision of the Code. The Plan contemplates that The Howard Bank as the holder of a secured claim will be paid, without interest, eight years after the effective date of the Plan. Within that period the machinery and equipment will become worthless or of very little value. Likewise, the Plan provides for payment to secured creditors, Amplas Machinery Systems, Inc., and Rextrusion Systems, Inc., without interest five years after the effective date of the Plan. Likewise, the machinery which these secured creditors hold as collateral will become worthless or of little value within that period of five years. It has also been established that FNBB has already suffered a substantial loss in the value of its collateral.

■ As a result the conclusion is inevitable that the Debtor may not enforce a "cram-down" against the secured creditor under § 1124(3) of the Code inasmuch as it does not have and will not have available unencumbered assets with which to pay these secured creditors cash equal to the allowed amount of their claims. The Debtor is not in any position to give them adequate protection.

## UNREASONABLE DELAY BY THE DEBTOR THAT IS PREJUDICIAL TO CREDITORS

The Debtor waited until the last day of the so-called "exclusive" period for it to file a plan and, even at that, it submitted one which appeared to be more of a worksheet than a legal document. In addition, it failed to file a proper disclosure statement and when it was amended in accordance with the Order of the Court the figures therein contained and the cash flow projections were unreliable. The Debtor has also failed to contact the Internal Revenue Service which as a priority creditor is entitled to payment in full or must agree to a postponement of payment. The net result is that the Debtor has been engaged in unreasonable delay to the prejudice of creditors.

The Court can only conclude that the Plan is visionary, impractical and speculative and does not merit further consideration. The action of the President of the Debtor Corporation in seizing the Mercedes Benz under an alleged security interest on the eve of the filing of the Petition in an effort to protect his own self-interest raises a serious question as to the good faith of the Debtor acting through this executive officer in submitting a Plan for Reorganization under Chapter 11. Lack of good faith is by itself sufficient cause for conversion to a Chapter 7 liquidation proceeding. *In re Tolco Properties, Inc.*, supra.

■ Under § 1112(b) the Court may either convert a Chapter 11 to a liquidation under Chapter 7 or dismiss the case, whichever is in the best interest of creditors and the estate. This is in the discretion of the court. As a matter of fact, the court may in its discretion convert a Chapter 11 to a Chapter 7 liquidation even if a party in interest has moved only for dismissal. *In Re Larmar Estates, Inc., Medaf Holding Corp.*, 6 B.R. 933, 3 C.B.C.2d 218 (Bkrtcy.E.D.N.Y.).

■ Under § 1112(b) of the Code a party in interest is required to establish only one of the enumerated grounds for conversion or rely on lack of good faith on the part of the debtor. From a review of the evidence this Court is satisfied that the movants have sustained their burden by establishing at least three of the enumerated causes for conversion as well as lack of good faith on the part of the Debtor. This Court is also convinced that the only motive of the Debtor in filing a Chapter 11 proceeding was a delaying tactic so that it could buy additional time in the hope that an investor would come forward and purchase the capital stock of the stockholders who appear to be the only ones to benefit from such action by the Debtor. It is similar to the situation in the case of *In re G–2 Realty Trust*, 6 B.R. 549, 2 C.B.C.2d 1344 (Bkrtcy.D.Mass.) where the debtor filed a Chapter 11 for the sole purpose of avoiding foreclosure. The Court ruled that such was not the intent of Chapter 11 and very succinctly pointed this out at page 1351 as follows:

"This Court is satisfied that the mere attempt to avoid a foreclosure sale in these circumstances is not the intent behind Chapter 11 of the Code nor does it demonstrate the required good faith in behalf of G–2 Realty. See, *In re Northland Construction Co.*, supra, at 760. Therefore, I find that G–2 Realty is not the type of entity properly within the contemplation of Chapter 11 and that to extend the benefits of that chapter to a debtor in such circumstances would be an abuse of the purposes of the Code."

The Motions for Conversion are granted and an appropriate Order is this day being entered.